**No. 25-11265**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

SALOMON BTESH,

*Petitioner-Appellant,*

v.

ISAAC BTESH

*Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Florida

No. 1:23-cv-23679-JB

---

# APPELLANT'S OPENING BRIEF

---

Edward M. Mullins
Daniel Alvarez Sox
Reed Smith LLP
200 S. Biscayne Blvd Ste 2600
Miami, FL 33131
Tel.: 786-747-0200

Carlos F. Concepcion
Concepcion Global PLLC
200 S. Biscayne Blvd Ste 2800
Miami, FL 33131
Tel: 305-444-6669

*Counsel for Petitioner-Appellant*
*Salomon Btesh*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 and 26.1-2, Appellant Salomon Btesh submits herein his certificate of interested persons:

### I. District Judge(s)

Becerra, Hon. Jacqueline – U.S. District Judge

### II. Parties and Related Entities

Banco de Bogota

Bayer, Neil

Beis Din of Florida

Botta Espinosa, Alfredo

Bresler, Rabbi Moshe Y.

Btesh, Salomon - Petitioner-Appellant

Btesh, Isaac - Respondent-Appellee

Btesh, Deborah

Btesh de Michaan, Raquel

Btesh de Snaider, Yvonne

Dickens, Zachary Brian

Eskenazi Cohen, Jack

Feiler, Jeffrey

Fundación Aryisa

Fundación Joyvon

Grupo Aval

Hernandez Correa, Gerardo

Josilowsky, Rabbi Yosef David

Lerner, Rabbi Meir Simcha

Markstein, Rabbi David

Miara, Rabbi Doron

Reinhard, Sanford N.

Rodes, Timothy

Mizrachi, David M.

NMB Aventura Realty, Inc.

Peretz, Rabbi David

Notis, Rabbi Avraham E.

**III. Conglomerates, Affiliates, Parent Corporations, Publicly Held Corporations Owning 10% or More of a Party's Stock, and Other Identifiable Legal Entities Related To A Party.**

None.

## IV. Attorneys, Persons, Associations of Persons, Firms, or Partnerships

Cantero, Raoul G. – Counsel for Respondent/Appellee

Concepcion Global PLLC – Law Firm for Petitioner/Appellant

Concepcion, Carlos Francisco - Counsel for Petitioner/Appellants

Mullins, Edward M. – Counsel for Petitioner/Appellants

Reed Smith LLP – Law Firm for Petitioners/Appellant

Robinson, James N. - Counsel for Respondent/Appellee

Sox, Daniel Alvarez – Counsel for Petitioner/Appellant

White & Case LLP – Law Firm for Respondent/Appellee

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Salomon Btesh respectfully requests oral argument, which would materially assist the Court in resolving this appeal because the issues presented are complex and implicate significant questions of both Federal and international law, many of which are of first impression in this Circuit, especially in light of the Supreme Court's recent holding in *Fuld v. PLO*, 606 U.S. 1, 4, 145 S. Ct. 2090, 2097 (2025). In addition, the magnitude of the case—reflected by an amount in controversy exceeding $134 million—underscores the importance of a full and thorough consideration by the Court.

## TABLE OF CONTENTS

**Page(s)**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .................................................. C-1

STATEMENT REGARDING ORAL ARGUMENT ..................................i

TABLE OF CONTENTS ..........................................................................ii

TABLE OF AUTHORITIES.......................................................................v

STATEMENT REGARDING SUBJECT-MATTER AND APPELLATE JURISDICTION ......................................................xii

STATEMENT OF THE ISSUES............................................................. 1

STATEMENT OF THE CASE ................................................................ 3

Introduction............................................................................. 3

Statement of Facts .................................................................... 4

Unauthorized Transfer and Sale of the Btesh Family's Interests in MultiBank ........................................................ 4

Panama Agreement and its Arbitration Clause Provide Mandatory Framework for Resolving Disputes ..................... 4

Miami Panel Issues International Arbitration Award Against Isaac.................................................................................... 6

Isaac's U.S. Contacts Include Education, Philanthropy, and Business .......................................................................... 10

Salomon Seeks Enforcement of Arbitral Award in Miami, the Seat of the Arbitration ........................................................ 11

Order On Appeal ..................................................................... 13

STANDARD OF REVIEW..................................................................... 17

SUMMARY OF THE ARGUMENT ...................................................... 17

ARGUMENT ......................................................................................... 20

I. THE PARTIES CONSENTED TO THE DISTRICT COURT'S JURISDICTION BY AGREEING THAT HALACHIC LAW WOULD GOVERN THEIR DISPUTES ....................................... 20

A. Halachic Law Establishing Respondent's Consent to District Court's Jurisdiction Was Undisputed ..................... 21

B. The Panel Had Arbitral Jurisdiction .................................. 24

II. RESPONDENT IS SUBJECT TO PERSONAL JURISDICTION PURSUANT TO 9 U.S.C. § 9 ............................ 35

A. The District Court Erred by Imposing A "Consent-To-Confirmation" Requirement On Section 9 in an Action Brought Pursuant to the Panama Convention..................... 38

B. Nothing in the FAA or Convention Prevents Severing Section 9's Conflicting Consent Provision ........................... 43

C. Section 9 is Constitutionally Sound under the Fifth Amendment ....................................................................... 44

III. THE DISTRICT COURT HAD PERSONAL JURISDICTION OVER RESPONDENT UNDER RULE 4(k)(2) ............................ 46

A. Rule 4(K)(2) Jurisdiction Addresses Situations Where the Foreign Respondent Has Pervasive Contacts with the United States but Not to a Single State......................... 47

B. Respondent's Multifaceted Contacts with the United States Meet Constitutional Requirements .......................... 47

C. The District Court Erroneously Applied *Daimler*'s Restrictive Due-Process Framework for Plenary Actions to This Summary Enforcement Proceeding.......................... 50

D. Requiring a Full Minimum Contacts Analysis for Arbitration Enforcement under Rule 4(k)(2) would Contradict U.S. Treaty Obligations..................................... 56

IV. THE DISTRICT COURT ERRED IN REFUSING TO EXERCISE *QUASI IN REM* JURISDICTION ............................ 58

A. The *Shaffer* Exception Eliminates Any Minimum-Contacts Requirement ....................................................... 59

B. The Panel Qualifies as a "Court of Competent Jurisdiction" Under *Shaffer* ................................................ 62

C. A Final Arbitral Award Is the Functional Equivalent of a Judgment........................................................................ 64

D. Respondent's Florida Assets Satisfy the Factual Predicate for *Quasi in Rem* Type II Jurisdiction ................. 66

CONCLUSION ................................................................................. 68

CERTIFICATE OF COMPLIANCE ........................................................ 70

CERTIFICATE OF SERVICE ............................................................... 71

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amazon.com, Inc. v. Glenn*,
2018 U.S. Dist. LEXIS 193499 (W.D. Wash. Nov. 13, 2018) .... 35

*Amazon.com, Inc. v. Glenn*,
No. C18-1289-MJP, 2018 WL 5921005 (W.D. Wash. Nov. 13, 2018) .... 42

*Argos Glob. Partner Servs., LLC v. Ciuchini*,
446 F. Supp. 3d 1073 (S.D. Fla. 2020) .... 32, 37

*Bamberger Rosenheim, Ltd. (Isr.) v. OA Dev., Inc.*,
862 F.3d 1284 (11th Cir. 2017) .... 34

*Brown v. Rauscher Pierce Refsnes, Inc.*,
994 F.2d 775 (11th Cir. 1993) .... 65

*Bunge S.A. v. Pac. Gulf Shipping (Singapore) Pte Ltd.*,
No. 3:19-cv-00491-SB, 2020 U.S. Dist. LEXIS 56169 (D. Or. Mar. 31, 2020) .... 62, 64

*Cat Charter, LLC v. Schurtenberger*,
646 F.3d 836 (11th Cir. 2011) .... 50, 53, 54

*Cerner Middle E. v. Icapital*,
2021 U.S. Dist. LEXIS 206304 (D. Or. Aug. 23, 2021) .... 60

*Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*,
500 F.3d 571 (7th Cir. 2007) .... 66

*CME Media Enters. B.V. v. Zelezny*,
01 Civ. 1733 (DC), 2001 U.S. Dist. LEXIS 13888 (S.D.N.Y. Sep. 10, 2001) .... 60, 61, 63

*CME Media Enters. B.V. v. Zelezny*,
No. 01 Civ. 1733 (DC), 2001 WL 1035138 (S.D.N.Y. Sept. 10, 2001) .......... 50, 51, 54, 64

*Comercio Ltda. v. Bertin*,
2024 U.S. Dist. LEXIS 9222 (S.D.N.Y. Jan. 18, 2024) .......... 61, 62, 67

*Commodities & Minerals Enter. v. CVG Ferrominera Orinoco, C.A.*,
49 F.4th 802 (2d Cir. 2022) .......... 56

*Commodities & Mins. Enter. v. CVG Ferrominera Orinoco*, C.A., 111 F.4th 1294 (11th Cir. 2024) .......... 64

*Corporación AIC, SA v. Hidroeléctrica Santa Rita S.A.*,
66 F.4th 876 (11th Cir. 2023) (*en banc*) .......... 64, 66

*Crescendo Mar. Co. v. Bank of Communs. Co.*,
*2016 U.S. Dist. LEXIS 21824, 2016 WL 750351 (S.D.N.Y Feb. 22, 2016)*
.......... 63, 64, 65, 67

*Czarina, L.L.C. v. W.F. Poe Syndicate*,
358 F.3d 1286 (11th Cir. 2004) .......... 23

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) .......... *passim*

*Dean v. Sullivan*,
118 F.3d 1170 (7th Cir. 1997) .......... 34

*Earth Sci. Tech, Inc. v. Impact UA, Inc.*,
809 F. App'x 600 (11th Cir. 2020) .......... 23

*Engenharia de Projeto Ltda. v. Republic of Peru*,
665 F.3d 384 (2d Cir. 2011) .......... 57

*First Kuwaiti Gen. Trading & Contracting W.L.L. v. Kellogg Brown & Root Int'l, Inc.*,
141 F.4th 522 (4th Cir. 2025) .......... *passim*

*Fuld v. PLO*,
606 U.S. 1, 145 S. Ct. 2090 (2025) .......... 2, 45

*Generational Equity LLC v. Schomaker*,
602 F. App'x 560 (3d Cir. 2015) .......... 20

*Ghaly v. Sun Pack & Ship, Inc.*,
No. 6:24-cv-629-CEM-UAM, 2025 U.S. Dist. LEXIS 6201
(M.D. Fla. Jan. 13, 2025) .......... 37

*Gherardi v. Citigroup Glob. Mkts., Inc.*,
975 F.3d 1232 (11th Cir. 2020) .......... 34

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*,
284 F.3d 1114 (9th Cir. 2002) .......... 42, 43, 54, 60

*Gov't of the Lao People's Democratic Republic v. Baldwin*,
No. 2:20-cv-00195-CRK, 2021 U.S. Dist. LEXIS 224212
(D. Idaho Nov. 19, 2021) .......... 61, 64

*Hausman v. Earlswood Enters.*,
95 Civ. 9088 (JSM), 1996 U.S. Dist. LEXIS 13428
(S.D.N.Y. Sep. 11, 1996) .......... 36

*Hausman v. Earlswood Enters.*,
No. 95 CIV. 9088 JSM, 1996 WL 527335 (S.D.N.Y. Sep.
16, 1996) .......... 42

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
139 S. Ct. 524 (2019) .......... 21, 33

*Hicks v. Bank of Am.*,
218 F. App'x 739 (10th Cir. 2007) .......... 33

*Holland Am. Line Inc. v. Wartsila N. Am., Inc.*,
485 F.3d 450 (9th Cir. 2007) .......... 55

*IBEW, Loc. Union No. 545 v. Hope Elec. Corp.*,
380 F.3d 1084 (8th Cir. 2004) .......... 34

*Idea Nuova, Inc. v. GM Licensing Grp., Inc.*,
617 F.3d 177 (2d Cir. 2010) .......... 20, 42

*Inzajat Tech. Fund, B.S.C. v. Najafi*,
No. C11-04133, 2012 U.S. Dist. LEXIS 32068 (N.D. Cal. Mar. 9, 2012) .......... 62, 64

*JPay, Inc. v. Kobel*,
904 F.3d 923 (11th Cir. 2018) .......... 30

*Karaha Bodas Co. v. Perusahaan Pertambangan*,
364 F.3d 274 (5th Cir. 2004) .......... 56

*La Dolce Vita Fine Dining Co. v. Zhang Lan*,
No. 21-cv-3071 (LAK), 2023 U.S. Dist. LEXIS 23196 (S.D.N.Y. Feb. 10, 2023) .......... 61, 64, 67

*Langlais v. Pennmont Benefit Servs.*,
527 F. App'x 215 (3d Cir. 2013) .......... 33

*McGregor & Werner, Inc. v. Motion Picture Lab. Technicians Loc.*,
806 F.2d 1003 (11th Cir. 1986) .......... 35

*N. Am. Sugar Indus., Inc. v. Xinjiang Goldwind Sci. & Tech. Co.*,
124 F.4th 1322 (11th Cir. 2025) .......... 17

*New Skies Satellites B.V. v. Gospel Ministries Int'l*,
No. 1:15-CV-27, 2016 WL 11506970 (E.D. Tenn. Apr. 5, 2016) .......... 42

*Oldfield v. Pueblo De Bahia Lora, S.A.*,
558 F.3d 1210 (11th Cir. 2009) .......... 17

*Olin Holdings Ltd. v. State of Libya*,
73 F.4th 92 (2d Cir. 2023) .......... 32

*P & P Indus., Inc. v. Sutter Corp.*,
179 F.3d 861 (10th Cir. 1999) .......... 20

*Phoenix*, 391 F.3d at 435 .................................................... 38, 39, 40, 43

*PTA-FLA, Inc. v. ZTE USA, Inc.*,
No. 3:11-cv-510-J- 32JRK, 2015 U.S. Dist. LEXIS 187448
(M.D. Fla. Aug. 5, 2015) .................................................................... 35

*PTA-FLA, Inc. v. ZTE USA, Inc.*,
No. 3:11-cv-510-J-32JRK, 2015 WL 12819186 (M.D. Fla.
Aug. 5, 2015) .................................................................................. 41

*Rainwater v. Nat'l Home Ins. Co.*,
944 F.2d 190 (4th Cir. 1991) .............................................................. 20

*Scherk v. Alberto-Culver Co.*,
417 U.S. 506 (1974) .................................................................... 38, 56

*Schneider v. Kingdom of Thailand*,
688 F.3d 68 (2d Cir. 2012) ................................................................. 32

*Sequip Participações S.A. v. Marinho*,
No. 15-23737-MC, 2018 WL 10593628 (S.D. Fla. Oct. 16,
2018) ........................................................................................ 50, 53

*Shaffer v. Heitner*,
433 U.S. 186, 210 n.36 (1977) .................................................. *passim*

*Shopmen's Loc. 539 v. Mosher Steel*,
796 F.2d 1361 (11th Cir. 1986) ........................................................... 33

*Sonera Holding B.V. v. Cukurova Holding A.S.*
750 F.3d 221 (2d Cir. 2014) ................................................ 42, 51, 52

*Spirit of the E., Ltd. Liab. Co. v. Yale Prods.*,
No. 22-13122, 2023, U.S. App. Lexis 8604 (11th Cir. Apr.
11, 2023) ........................................................................................ 34

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
559 U.S. 662 (2010) .......................................................................... 30

*Stone & Webster, Inc. v. Triplefine Int'l Corp.*,
118 F. App'x 546 (2d Cir. 2004) .......................................................... 40

*Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*,
432 F.3d 1327 (11th Cir. 2005) .......... 21

*Thompson v. Carnival Corp.*,
174 F. Supp. 3d 1327 (S.D. Fla. 2016) .......... 54

*Titan Corp. v. Support Sys. Assocs.*,
315 F. App'x 870 (11th Cir. 2009) .......... 31

*Vantage Mezzanine Fund II P'ship Acting Through Vantage Mezzanine Fund II Pty. Ltd. v. Taylor*,
2024 U.S. Dist. LEXIS 175937 (S.D.N.Y. Sept. 27, 2024) .......... 66

*Vital Pharm. v. Pepsico, Inc.*,
528 F. Supp. 3d 1304 (S.D. Fla. 2020) .......... 33

*WasteCare Corp. v. Harmony Enters.*,
822 F. App'x 892 (11th Cir. 2020) .......... 20

*Weststar Assocs., Inc. v. Tin Metals Co.*,
752 F.2d 5 (1st Cir. 1985) .......... 20, 24

*World Wide Supply Ou v. Quail Cruises Ship Mgmt.*,
802 F.3d 1255 (11th Cir. 2015) .......... 60

*World Wide Supply Ou v. Quail Cruises Ship Mgmt.*,
803 F.3d 1255 (11th Cir. 2015) .......... 67

*Your CBD Stores Franchising, LLC v. Buckwalter*,
No. 8:23-cv-1550-VMC-AAS, 2023 U.S. Dist. LEXIS 183330 (M.D. Fla. Oct. 12, 2023) .......... 33

**Statutes**

9 U.S.C. § 9 .......... *passim*

9 U.S.C. § 207 .......... *passim*

9 U.S.C. § 208 .......... 40, 41, 43

9 U.S.C. § 307 .......... 40, 41, 43

G. B. Born, *Int'l Comm. Arb.* § 26.02 (Kluwer Law Int' 3d ed. 2024) ... 57

**Rules**

Fed. R. Civ. P. 4(k)(2) ... *passim*

**Other Authorities**

Park & Yanos, *Treaty Obligations & National Law: Emerging Conflicts in International Arbitration*, 58 Hastings L.J. 251, 255–56 (2006) ... 58

van den Berg, *The New York Arbitration Convention of 1958: Towards a Uniform Judicial Interpretation* 239 (1981) ... 57

## STATEMENT REGARDING SUBJECT-MATTER AND APPELLATE JURISDICTION

Petitioner/Appellant Salomon Btesh brought the action below to confirm and enforce a final arbitral award (the "Award") entered against Respondent/Appellee Isaac Btesh pursuant to the Inter-American Convention on International Commercial Arbitration ("Panama Convention"), codified at Chapter Three of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 301 *et seq*. Chapter 3 incorporates Chapter Two of the FAA, 9 U.S.C. §§ 201-208 for the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention") (the Panama and New York Conventions are the "Conventions"). The District Court had original jurisdiction pursuant to 28 U.S.C. § 1331 and 9 U.S.C. §§ 203, 302.

This appeal arises from the District Court's final March 21, 2025 order dismissing Salomon's Amended Petition to Confirm an International Commercial Arbitral Award (the "Petition"). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Did the District Court err by dismissing the Petition for lack of personal jurisdiction over Isaac, leaving Petitioner/Appellant without a forum to confirm an international arbitral award entered in the District by a rabbinical panel?

(1) **Halachic Law/Consent and Waiver**. Did the District Court err in finding that Halachic law provided no basis to exercise personal jurisdiction over a respondent, including by consent or waiver when a) pursuant to Halachic law, by failing to appear for a properly noticed arbitration he waives the right to challenge the panel's jurisdiction, as well as the jurisdiction of the courts in the district where the final award is entered to confirm and enforce the award and b) the panel itself determined it had jurisdiction based on its interpretation of the operative contract?

(2) **9 U.S.C. § 9**. Did the District Court err when it declined to exercise personal jurisdiction pursuant to 9 U.S.C. § 9 based on a purported failure to satisfy Section 9's consent-to-confirmation requirement, when(a) such requirement is preempted by the Conventions, (b) Respondent consented to confirmation through

his agreement that Halachic law would govern the substantive and procedural aspects of any disputes between the parties, and (c) *Fuld v. PLO*, 606 U.S. 1, 4, 145 S. Ct. 2090, 2097 (2025), holds that personal jurisdiction grounded in federal statutes are subject to the Fifth Amendment, which does not incorporate the Fourteeth Amendment's minimum contacts standard?

(3) **Federal Rule of Civil Procedure 4(k)(2).** Did the District Court err when it declined to exercise personal jurisdiction under Rule 4(k)(2) by applying the plenary-litigation standards of *Daimler* rather than the reduced due-process threshold governing summary confirmation proceedings? and

(4) **Quasi In Rem.** Did the District Court err when it declined to exercise *quasi in rem* jurisdiction even though Respondent maintains assets in Florida because the Award had not been confirmed elsewhere first and when the Court below was the primary jurisdiction?

## STATEMENT OF THE CASE

### Introduction

This appeal arises from the District Court's dismissal for lack of personal jurisdiction of Petitioner/Appellant Salomon Btesh's ("Salomon") Petition to confirm and enforce an international arbitral award (the "Award") issued against Respondent/Appellee Isaac Btesh ("Isaac"). The Award—issued in Miami by a Rabbinical tribunal (the "Panel")—conclusively adjudicated a dispute over Isaac's improper acquisition and sale of assets related to the parties' inheritance from their father's estate. Isaac has deep, enduring ties to Florida and the United States. He lives part-time in a Miami condominium owned through his wholly owned company. He has bank accounts in Florida and New York, owns a vehicle in Florida and pays an agent (his former lawyer) to manage his condominium and pay his expenses in Florida. He had vast charitable contacts in the U.S. and publishes here.

However, the District Court determined that it lacked personal and *quasi in rem* jurisdiction and dismissed the Petition. It rejected jurisdictional theories grounded in Isaac's consent under the arbitration clause and Halachic procedural rules, Federal Rule of Civil Procedure 4(k)(2), Section 9 of the FAA, and *quasi in rem* authority over his Florida

property.

The District Court erred in declining jurisdiction despite the Panel's authority over the dispute, Isaac's substantial Florida and U.S. connections, and the presence of specific property in the District.

**Statement of Facts**

**Unauthorized Transfer and Sale of the Btesh Family's Interests in MultiBank**

Alberto Salomon Btesh Hazzan ("Btesh Sr."), was the father of Salomon and Isaac. DKT.51 at 11(¶53); DKT.51-1 at 6. Btesh Sr. was the founder of the prominent MultiBank financial institutions in Panama.

In November 2019, while Btesh Sr. was mentally impaired, Isaac improperly orchestrated the transfer of their father's shares in MultiBank to himself and his two sisters, without Salomon's knowledge or approval, in violation of Halachic law. DKT.51 at 11(¶55); DKT.51-1 at 6,9–10.

**Panama Agreement and its Arbitration Clause Provide Mandatory Framework for Resolving Disputes**

On January 22, 2020, the parties entered into a written agreement (the "Panama Agreement") to resolve their disputes regarding the inheritance of their late father's estate. DKT.51-1 at 21–24. The Panama Agreement provided for arbitration to resolve any disputes:

In the event of any difference or dispute as to the

> performance, interpretation, execution and/or scope of this document, THE PARTIES submit exclusively to the alternative dispute resolution methods in effect for members of the Israeli Charitable Society Shevet Ahim, waiving any other legal recourse in any jurisdiction.

DKT.51-1 at 24(¶16) ("Arbitration Clause" or "Paragraph 16").

The Arbitration Clause relies on the parties' religious community's arbitration processes—known as a "Din Torah" and conducted before a rabbinical panel ("Beth Din")—as the exclusive mechanism for dispute resolution, consistent with Jewish Orthodox practice. DKT.51-1 at 3–5 (rabbinical panel's jurisdictional and procedural rulings), 24(¶16). The parties' agreement to resolve disputes pursuant to Halachic law was undisputed. DKT.51 ¶¶3, 59; *infra* note 3.

Salomon's expert established that, pursuant to Halachic law, parties to a Beis Din proceeding consent and waive any challenge to the personal jurisdiction of the federal or state court in the location where the tribunal issues its award—here, Miami-Dade County. DKT.63-1 ¶¶14–15.

In his declaration, Isaac confirmed that the only alternative dispute resolution methods in effect for members of Shevet Ahim are mediation and arbitration before a rabbinical court and that the parties agreed to

"religious arbitration" "before *a* rabbinical court." DKT.25-1¶¶28, 31–32 (emphasis added).

**Miami Panel Issues International Arbitration Award Against Isaac**

On September 8, 2023, following extensive evidence, the Panel issued its Award. DKT.51-1 at 1–14; DKT.51¶¶2, 66. It confirms that the methodology referenced in Paragraph 16 of the Panama Agreement "pertains to Halacha" and that "the jurisdiction under Halacha law resides with the Beis Din that issues the summonses." DKT.51-1 at 3. It states that "the legal framework applied by the Beis Din to resolve this dispute is the Halacha" and that "the unequivocal intent of all signatories to the Panama Agreement was to adopt this framework," consistent with "the standard practice of all Batei Din (Rabbinical Courts), whose jurisdiction has been duly acknowledged and accepted by the Parties involved." DKT.51-1 at 4. The Panel declared that "the Beis Din undeniably has jurisdiction" and that "[t]he procedural approach used by the members of Shevet Ahim . . . [is] Halacha" and "[a]ny ruling must be based on accepted Halachic practices." DKT.51-1 at 4, 13. The Panel also held that the parties consented to judicial enforcement of the Award. *Id.* at 4

The Panel addressed jurisdictional, procedural, and substantive issues:

*First*, the Panel found it had jurisdiction over the parties' dispute pursuant to the Panama Agreement's Arbitration Clause, which mandates arbitration according to Halachic law and procedures approved by the Shevet Ahim Jewish Congregation. DKT.51-1 at 3–5, 24(¶16). In its award, the Panel stated:

> Based upon the evidence submitted, specifically paragraph 16 of the Panama Agreement, this Beis Din finds that: (A) We hold jurisdiction over all matters pertaining to the Panama Agreement. This encompasses not only the explicit details and provisions of the agreement but also any background issues that influence its implementation; (B) Any ruling must be based on accepted Halachic practices; and (C) The ensuing award falls within the scope of the Parties' agreement to resolve dispute through arbitration.

DKT.51-1 at 13.

*Second*, the Panel found Isaac's transfer of the MultiBank shares from his incapacitated father to himself and his siblings was invalid under Halachic law and the Panama Agreement. DKT.51-1 at 8–10.

*Third*, the Panel found Isaac owed Salomon damages totaling $134,950,000.00, representing his rightful share of inheritance proceeds from the sale of MultiBank, which Isaac withheld. DKT.51-1 at 10–15.

The Panel issued the Award after evaluating evidence, analyzing Halachic law, and acknowledging Isaac's refusal to participate in the proceedings despite receiving notice via multiple summonses. DKT.51-1 at 1–2, 8, 12–14, 18. Even then, the Panel ruled in his favor on an issue. DKT.51-1 at 13.

The Award constitutes a comprehensive, reasoned, and binding determination in accordance with the Panama Agreement, Halachic law, and international arbitral principles. DKT.51-1 at 3–14, 24(¶16).

**Isaac Has Extensive Connections to Florida**

Isaac's personal and financial connections to Florida reflect property ownership, business dealings, and financial management activities:

**Residential Property:** Isaac purchased a condominium in Miami-Dade County (the "Miami Home") in 2009. DKT.51 ¶¶18–19. With the assistance of his Florida attorney, he deeded the Miami Home to NMB Aventura Realty, Inc. ("NMB Realty"), a Panamanian single-purpose entity Isaac owns and controls. DKT.58-1 ¶13; DKT.63-2; DKT.63-3. Isaac retained Panamanian attorney David Mizrachi—licensed in Florida—to create NMB Realty. DKT.63-5 at 61:19–22, 62:19–21. The

Miami Home continues to serve as Isaac's primary Florida residence. Isaac employs Florida-based attorney and property manager, Sanford Reinhard, to manage this property, including paying bills and expenses. DKT.85-1 at 20:13–21:8. Isaac holds an equitable interest in the Miami Home through his ownership of NMB Realty. DKT.83-3; DKT.83-4; DKT.85-1 at 38:14–16, 39:8–40:9.

**Financial and Banking Relationships:** Isaac maintains active banking relationships in Florida. He maintains financial assets at JPMorgan in the United States, using a bank account for managing personal expenses and credit obligations and a brokerage account for securities. DKT.58-1 at 2-3 (¶17); DKT.51 ¶22; DKT.63-5 at 46:1–47:10. Isaac employs investment advisors in Florida, where he meets them. DKT.63-5 at 41:24–42:2, 42:18–43:23, Ex. 11. Isaac has sent and received business communications from Florida. DKT.63-5 at 64:3–5. He holds a beneficial interest in a Northern Trust property management account in Miami, controlled by Reinhard, through which bills for the Miami Home are paid, including phone, utilities, taxes, insurance, and vehicle expenses. DKT.85-1 at 26:8–28:17, 47:5–19; DKT.51 ¶¶21–22. Reinhard retains in Miami the original stock certificates for NMB Realty, one each

to Isaac and his wife. DKT.85-1 at 38:23–39:4, 39:21–25.

**Vehicle and Personal Property:** Isaac owns a vehicle registered in Florida, using it during stays. DKT.51 ¶23; DKT.58 at 20; DKT.58-1 at 2(¶16); DKT.63-5 at 98–99; DKT.63-5 at 98:19–21; DKT.63-10.

**Frequent Presence:** Isaac has traveled to the United States more than seventy times over the past eighteen years, substantially to Florida. DKT.51 ¶¶24–25; DKT.63-5, Ex. 15. Isaac maintains a local Florida cell phone number. DKT.58-1 ¶19. Isaac has donated to and attends a synagogue in Miami. DKT.51 ¶26; DKT.58-1 at 4(¶20).

### Isaac's U.S. Contacts Include Education, Philanthropy, and Business

Isaac maintains connections to the United States beyond Florida:

**Education:** Isaac obtained multiple degrees in the United States, graduating from Tulane, the University of Oklahoma, and the University of Louisville. DKT.51 ¶32.

**Philanthropy:** Isaac engages in philanthropic endeavors within the United States, including contributions to institutions such as the Chabad at Tulane. DKT.51 ¶33; DKT.58-1 at 4(¶21). His donations have been recognized through naming rights, notably the "Btesh Family Chabad House" at Tulane. DKT.51 ¶33.

**Commercial and Cultural Engagement:** Isaac published a book, *"The Pharaoh's Dream,"* in the U.S. market. DKT.51 ¶34; DKT.58-1 at 3 (¶¶10–11).

**Salomon Seeks Enforcement of Arbitral Award in Miami, the Seat of the Arbitration**

On September 27, 2023, Salomon filed a Petition in the District Court to confirm and enforce the Award. DKT.1. On January 17, 2024, following jurisdictional discovery, he filed an Amended Petition. DKT.51. There, he asserted multiple bases for jurisdiction, including:

- **Consent to Arbitration:** Isaac consented to arbitration with its seat in Miami, agreeing to resolve disputes under the Panama Agreement through arbitration conducted pursuant to Orthodox Jewish Halachic law and procedures. DKT.51 ¶¶10–17. Salomon provided the affidavit of Rabbi Meir Simcha Lerner who opined that, pursuant to Halachic Law (Jewish law), Issac consented to and waived any right to challenge the District Court's personal jurisdiction over him for enforcement. DKT.63-1 ¶¶14–15.
- **FAA § 9:** Section 9 of the FAA (9 U.S.C. § 9), applied as the arbitral proceedings were held in Miami. DKT.51 ¶¶37–39.
- **Federal Rule of Civil Procedure 4(k)(2):** Given Isaac's contacts

with the United States—including educational, philanthropic, and business engagements—jurisdiction was invoked under Rule 4(k)(2). DKT.51 ¶¶32–36.

- ***Quasi-in-rem* jurisdiction:** Isaac's ownership of assets located in Florida, including his property and financial accounts. DKT.51 ¶¶40–50.

On February 26, 2024, Isaac moved to dismiss for lack of personal jurisdiction. DKT.58. Isaac argued that none of the pleaded jurisdictional theories applied and the Court lacked authority to reach the merits.

Salomon opposed on March 21, 2024, supported by documentary evidence, deposition testimony, and expert declarations. DKT.63. Salomon contended that Isaac had consented to jurisdiction, maintained substantial, systematic U.S. and Florida contacts, and owned multiple Florida assets sufficient to support *quasi in rem* jurisdiction.

Following a May 13, 2024 hearing (DKT.75), the District Court ordered supplemental briefing on the question of whether *quasi in rem* jurisdiction was available to enforce an unconfirmed arbitral award under *Shaffer v. Heitner*. DKT.78. Following briefing, the District Court heard further oral argument on that issue. DKT.84.

**Order On Appeal**

On March 21, 2025, the District Court dismissed Salomon's Petition to enforce the Award based on lack of personal jurisdiction. DKT.92. The Court rejected the jurisdictional arguments Salomon advanced, including waiver, specific jurisdiction arising from the arbitration agreement, jurisdiction under Section 9 of the FAA, Rule 4(k)(2), and *quasi in rem* jurisdiction. The Court concluded that none conferred personal jurisdiction and that *quasi in rem* jurisdiction was unavailable because the Award had not been confirmed elsewhere first. DKT.92.

The Court concluded Isaac had not consented to personal jurisdiction in Florida because the Panama Agreement did not incorporate any arbitration rules containing a consent-to-confirmation clause. DKT.92 at 26–34. Salomon's theory was that, by agreeing in Paragraph 16 to resolve disputes under Halachic law before a rabbinical tribunal, Isaac accepted Beth Din Rules, which codify Halachic principles and include consenting to entry of judgment in any court with jurisdiction. He argued that Jewish law itself recognizes that jurisdiction lies in the courts where the tribunal sits, and that Isaac—by refusing to appear—had waived any right to contest the tribunal's jurisdiction.

The Court rejected this theory. DKT.92 at 28–31. It found no provision of Jewish law establishing consent to court jurisdiction, no language in the Panama Agreement adopting the Beth Din Rules, and no basis to treat those Rules as "default" for all U.S. rabbinical courts. DKT.92 at 28–30. Even assuming nonappearance could trigger waiver, the District Court held, that waiver cannot incorporate rules never agreed to.

On that record, the Court held that Salomon had not carried his burden to show consent. DKT.92 at 33–34.

The Court also considered jurisdiction based on 9 U.S.C. § 9, which permits an application to confirm an arbitration award in the district where the award was made if no court is specified in the agreement, and provides that the court "shall have jurisdiction" over the served party as if it had appeared generally. DKT.92 at 38–39. Salomon argued that because the Panama Agreement did not name a confirming court, the Beis Din of Florida issued the award in this District, and Isaac was properly served, the statute supplied jurisdiction. The Court rejected this theory because it contended Section 9's jurisdictional language applies only when the parties have agreed that judgment may be entered on the

award. The Court concluded that no such consent appeared in the Panama Agreement or through incorporated rules. *Id.* at 39–40. The Court rejected Salomon's contention that the consent requirement was pre-empted in a Convention case, finding that both Section 207 and the Convention are silent on personal jurisdiction leaving due process intact.

The Court also considered Salomon's reliance on Rule 4(k)(2), which permits jurisdiction in federal question cases when the defendant is not subject to jurisdiction in any state and exercising jurisdiction accords with the Constitution and federal law. DKT.92 at 34–35. The Court found the first two requirements satisfied: the claim arises under the Panama Convention and Isaac had not identified any state where he would be subject to general jurisdiction. DKT.92 at 36. The dispute therefore turned on whether Isaac's contacts with the United States as a whole met due process standards for general jurisdiction.

The Court determined that Isaac's contacts in the U.S., when combined with the Florida contacts, were insufficient to show the "continuous and systematic" presence required under *Daimler AG v. Bauman*, 571 U.S. 117 (2014). It emphasized that general jurisdiction under 4(k)(2) is limited to extraordinary cases, such as terrorism matters,

and concluded Isaac's U.S. ties were insufficient. *Id.* at 37–38.

The Court also rejected Salomon's alternative argument that the Court could enforce the award against Isaac's Florida property under *quasi-in-rem* type II jurisdiction. Salomon identified multiple known Florida assets—bank accounts, a vehicle, stock in NMB Realty, and his interest in the Miami condominium—and invoked the *Shaffer* "exception," allowing enforcement against local property once a "court of competent jurisdiction" has adjudicated the debt. Salomon maintained that the Beis Din of Florida was such a tribunal, and that due process therefore did not require showing minimum contacts.

The Court rejected that theory. DKT.92 at 43–51. It found no authority for treating the Beis Din award as one rendered by a "court of competent jurisdiction" within the meaning of *Shaffer* absent prior judicial confirmation. DKT.92 at 47–48. In the court's view, the cases Salomon cited either assumed the point without analysis or involved arbitral awards already confirmed by a court in the primary or secondary jurisdiction. *Id.* Because the Award had not been reduced to judgment before and Isaac disputed the tribunal's authority, the Court concluded that the *Shaffer* exception did not apply. DKT.92 at 50–51. The Court

then applied the usual minimum contacts analysis, which it already found lacking. DKT.92 at 50–51.

## STANDARD OF REVIEW

"[T]he issue of whether personal jurisdiction is present is a question of law and subject to *de novo* review." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1217 (11th Cir. 2009). Where the District Court found no personal jurisdiction without an evidentiary hearing, this Court's review of the factual representations is *de novo*. *See N. Am. Sugar Indus., Inc. v. Xinjiang Goldwind Sci. & Tech. Co.*, 124 F.4th 1322, 1332–33 (11th Cir. 2025).

## SUMMARY OF THE ARGUMENT

This appeal arises under one of the most pro-enforcement regimes in American law: the FAA as modified by the Convention. Yet, the District Court erected jurisdictional hurdles that neither the FAA nor due process requires.

First, the parties' contract resolves the jurisdiction question. By selecting Halachic law, the parties expressly consented to enforcement of any resulting award in the courts of the district where the Panel sits. Such an agreement constitutes a knowing waiver of jurisdictional objections. The undisputed expert testimony on Halachic law so

confirmed.

Second, Section 9 of the FAA confers personal jurisdiction where the award is rendered and notice is served. Congress preserved that test, directing that conflicting clauses—like Section 9's consent-provision—yield to the Convention's streamlined procedure. By insisting on consent, the District Court contravened the text, upended precedent, and transformed a local award into a jurisdictional orphan. Section 9 is constitutional.

Third, the District Court possessed jurisdiction under Rule 4(k)(2). Respondent's business, travel, property, banking, and philanthropic presence in the U.S. satisfies national-contacts due process—especially in summary confirmation proceedings where liability is fixed. Instead of the lighter Shaffer standard, appropriate here, the District Court imposed Daimler's "at home" test, meant for plenary suits. That error compels reversal.

Fourth, even if *in personam* were lacking, the Court was obligated to exercise *quasi-in-rem* jurisdiction over Respondent's Florida assets. The *Shaffer* exception removes any minimum-contacts inquiry once a court of competent jurisdiction—here, the Miami Beis Din—has

adjudicated liability. Respondent's acknowledged bank accounts, real-estate interests, and other property within the District provided sufficient contacts to anchor enforcement. By insisting that the Award first be "converted" into a judgment elsewhere, the Court reversed the Convention's logic and created exactly the multi-forum detour that Congress eliminated. Issac's collateral attacks on the Panel's authority were waived twice over: he agreed to delegate all arbitrability issues to the Beis Din and then refused to appear before it. A party may not sandbag the arbitrators by boycotting the hearing and later invoking the very objections on enforcement he declined to raise before the Panel.

This Court should reverse.

## ARGUMENT

### I. THE PARTIES CONSENTED TO THE DISTRICT COURT'S JURISDICTION BY AGREEING THAT HALACHIC LAW WOULD GOVERN THEIR DISPUTES

Parties consent to a district court's personal jurisdiction to enforce an arbitral award by contracting to apply dispute resolution procedures codifying such consent. In *Weststar Assocs., Inc. v. Tin Metals Co.*, 752 F.2d 5 (1st Cir. 1985), the court held that the respondent had consented to the personal jurisdiction of the district court seated where the award was entered "by agreeing to settle any disputes arising out of the contract according to the AAA Rules, which . . . provide that a party shall be deemed to have consented to the enforcement of the award in any state or federal court having jurisdiction thereof."[1]

Since *Weststar*, the Supreme Court and this Circuit have reaffirmed that parties waive substantive rights that conflict with the procedural rules they agreed would govern their disputes. *See WasteCare*

[1]752 F.2d at 7; *see Generational Equity LLC v. Schomaker*, 602 F. App'x 560, 562 (3d Cir. 2015) (provision adopting AAA rules satisfied domestic consent-to-confirmation requirement because rules state parties consent to entry of judgment). *Accord Idea Nuova, Inc. v. GM Licensing Grp., Inc.*, 617 F.3d 177, 181 (2d Cir. 2010); *P & P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 867 (10th Cir. 1999); *Rainwater v. Nat'l Home Ins. Co.*, 944 F.2d 190, 193 (4th Cir. 1991).

*Corp. v. Harmony Enters.*, 822 F. App'x 892, 896 (11th Cir. 2020) (incorporation of AAA Rules "serves as a clear and unmistakable delegation of questions of arbitrability to an arbitrator"); *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332 (11th Cir. 2005) (same); *Henry Schein, Inc. v. Archer & White Sales, Inc.,* 139 S. Ct. 524, 529 (2019) (eliminating "wholly groundless" exception). This is dispositive of the District Court's personal jurisdiction.

### A. Halachic Law Establishing Respondent's Consent to District Court's Jurisdiction Was Undisputed

Two facts establish that Issac waived his right to challenge the District Court's personal jurisdiction: **(a)** he agreed in Paragraph 16 that Halachic law would govern the substantive and procedural resolution of all disputes, DKT.92 at 4, *infra* note 3; and **(b)** pursuant to Halachic law, parties consent that the federal and state courts where the tribunal enters the award will have jurisdiction to enforce the award. DKT.63-1 ¶¶14–16.

The District Court correctly held that no dispute exists as to the first fact—the parties agreed in Paragraph 16 to apply Halachic law. DKT.92 at 4 (parties "appear to agree that it contemplated proceedings before a rabbinical court known as a Beit Din or Beis Din, which

adjudicates matters according to Jewish law.”). But the District Court erred in holding that “neither Petitioner’s response nor the Lerner Declaration cite to any tenet of Jewish law that show Respondent’s consent to this Court’s jurisdiction.” DKT.92 at 28.

Contrary to this holding, Rabbi Lerner explained that, pursuant to Halachic law (*i.e.* Jewish law), Issac consented to and waived any right to challenge the District Court’s personal jurisdiction over him to enforce the Award:

> [A] party who is bound (either affirmatively or by waiver) to Halachic Law and/or the Beth Din Rules and Procedures **consents and waives any challenge to the personal jurisdiction of any Federal or state court having jurisdiction over the subject matter**—namely the enforcement of the arbitration award . . . . Under Halachic Law, **‘jurisdiction’ extends to the courts presiding in the place where the awarding Beis Din is located, in this case, Miami**.

DKT.63-1¶¶14–15 (emphasis added).

Applying Halachic law, he further concluded:

> Thus, because the Beis Din of Florida issued the Final Award, and having waived any right to challenge the Beis Din of Florida’s jurisdiction and the application of the Beth Din Rules and Procedures to the dispute, Isaac Btesh consented to the jurisdiction of the Federal District Court for

> the Southern District of Florida to recognize and enforce the Final Award.

*Id.* ¶16.[2]

Issac did not refute these statements of Halachic law concerning his assent to the District Court's jurisdiction. Rather, he relied on the declaration of Rabbi Yosef David Josilowsky ("Josilowsky Declaration"), which addressed only the separate issue of whether *the Panel* had jurisdiction to enter its Award. *See generally* DKT.67-1. While an arbitral panel's ultimate lack of jurisdiction might be a basis to invalidate an award, that is an issue for consideration on the merits during enforcement, not at the motion to dismiss stage when considering the district court's jurisdiction. *See Czarina, L.L.C. v. W.F. Poe Syndicate*, 358 F.3d 1286, 1292 n.3 (11th Cir. 2004) (distinguishing between in article IV requirements and article V affirmative defenses to confirmation; "award is presumed to be confirmable" upon satisfaction of article IV requirement of certified copy of award and arbitral agreement").

---

[2] The District Court had subject matter jurisdiction to confirm the Award. *Earth Sci. Tech, Inc. v. Impact UA, Inc.*, 809 F. App'x 600, 605 (11th Cir. 2020); DKT.92 at 2 n.2 (confirmation governed by Panama Convention); DKT.51 ¶¶1, 8; 58 at 5 (award falls under same).

The dispositive issue for purposes of establishing the District Court's personal jurisdiction to enforce the Award was whether the parties' selection of Halachic law to govern the substantive and procedural aspects of their disputes constituted consent to the District Court's jurisdiction to enforce the award, as is the case when parties select AAA or other arbitral rules providing "that a party shall be deemed to have consented to the enforcement of the award in any state or federal court having jurisdiction thereof." *Weststar*, 752 F.2d at 7; *supra* note 1.

The District Court should have answered that question in the affirmative based on Rabbi Lerner's unrebutted opinions. DKT.63-1. ¶¶14–16, 15 ("Under Halachic Law, 'jurisdiction' extends to the courts presiding in the place where the awarding Beis Din is located, in this case, Miami"), as well as on Salomon's undisputed allegation that "the rules of procedure governing the arbitration state that 'Parties to these Rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any Federal or state court having jurisdiction thereof.'" DKT.51 ¶15.

### B. The Panel Had Arbitral Jurisdiction

Even if the District Court properly had considered the issue at the

motion to dismiss stage, it should have held that the Panel had arbitral jurisdiction to enter the Award:

***First***, the Lener Declaration and the Panel (comprised of three rabbis) concluded that it had arbitral jurisdiction. The Panel's analysis was based on its well-reasoned interpretation of Paragraph 16 under Halachic law.[3] The Panel held:

> Based upon the evidence submitted, specifically paragraph 16 of the Panama Agreement, this Beis Din finds that:
>
> A. We hold jurisdiction over all matters pertaining to the Panama agreement. This encompasses not only the explicit details and

---

[3] DKT.25-1 ¶¶28 (Isaac attested "only alternative dispute resolution methods in effect for members of [*Shevet Ahim*]" include "mediation and arbitration before a Rabbinical court"), ¶¶28, 31-32 (Isaac attested had agreed to "arbitration before a Rabbinical court" and "religious arbitration"); DKT.51 ¶3, 59 (Isaac not deny thus admitted Salomon's allegation that "parties agreed in paragraph 16" to "alternative dispute resolution method pursuant to Halacha law"); DKT.92 at 4 (Court held that parties "appear to agree that it contemplated proceedings before a rabbinical court known as a Beit Din or Beis Din, which adjudicates matters according to Jewish law"); DKT.51-1 at 3 ("clear" methodology in paragraph 16 "pertains to Halacha"), 4 ("legal framework applied by the *Beis Din* to resolve this dispute is the Halacha; "unequivocal intent of all signatories" "to adopt this framework," "standard practice of ALL *Batei Din* (Rabbinical Courts)"), 4 ("jurisdiction under Halachic law resides with the *Beis Din* that issues the summonses"), 4 ("The Beis Din undeniably has jurisdiction"), 13 ("procedural approach used by the members of Shevet Ahim [is] Halacha"; "[a]ny ruling must be based on accepted Halachic practices").

> provisions of the agreement but also any background issues that influence its implementation . . . AND
>
> B. Any ruling must be based on accepted Halachic practices, AND
>
> C. The ensuing award falls within the scope of the Parties' agreement to resolve dispute through arbitration . . . .

DKT.51-1 at 14.

Lerner also established that waiver was an independent basis for the Panel's exercise of jurisdiction under Halachic law. He explained that, under Halachic law, Issac had waived any challenge to the Panel's arbitral jurisdiction by refusing to appear in the Arbitration. DKT.63-1 ¶¶10–16:

> [I]n the event both Parties to a dispute have submitted themselves exclusively to Halachic jurisdiction, by failing to respond to the summons, the summoned party waives any right to challenge, and by default accepts, the *Beis Din*'s jurisdiction over the person and the dispute, as well as the application of Halachic Law and the Beth Din Rules and Procedures to the dispute, including any post-judgment proceedings in secular court.

*Id.* ¶10; DKT.25-1¶¶28, 31-32 (Issac conceding the parties submitted to religious "arbitration before a Rabbinical court").

Applying Halachic law to the undisputed facts, Lerner concluded that the effect of Issac's failure to appear despite being properly summoned by the Beis Din of Florida was that . . .

> [H]e waived any right to challenge, and by default accepted, the Beth Din's jurisdiction over him and the dispute, as well as the application of Halachic Law and the Beth Din Rules and Procedures to the dispute, including this post-judgment proceeding.

*Id.* ¶12.

The District Court held that Petitioner's argument that Issac waived his right to challenge the Panel's jurisdiction (the "Waiver Rule") "relies on a series of stacked inferences." DKT.92 at 26. But the Court misunderstood the Lerner Declaration and Salomon's arguments as suggesting that the Waiver Rule was not a tenet of Halachic Law, but a rule imposed only by the Beth Din Rules and Procedures. DKT.92 at 26. Accordingly, the Court held that Petitioner's attempt to impose the Waiver Rule would have required it to find that Issac consented to Halachic law, pursuant to which he had waived any right to challenge application of the Beth Din Rules and Procedures, which, in turn, provide that he waived any right to challenge the Panel's arbitral jurisdiction by refusing to appear. *Id.*

While Salomon did propose that as an alternative, he relied on a more direct path: Lerner plainly attested, as Salomon argued, that the Waiver Rule is a fundamental tenant of *Halachic law*, and its existence in the Beth Din Rules and Procedures is derived therefrom. DKT.63-1 ¶¶7-8. The codification of the Waiver Rule in the Beth Din Rules and Procedures demonstrates that it is a universally accepted tenant of Halachic law, *id.*, which the parties **agreed** would govern their disputes. *See supra* note 3. Thus, contrary to the Court's holding, Issac's argument simply required a finding that the parties agreed via Paragraph 16 to apply Halachic law (which was undisputed), and that the Waiver Rule is a tenant of Halachic law (which also was undisputed).

Issac did not dispute that, under Halachic law, a party who refuses to appear for a properly summoned Beis Din proceeding waives his right to challenge the tribunal's jurisdiction. Rabbi Josilowsky avoided this principle of Halachic law by ignoring Issac's admission that he refused to appear for the Arbitration. There is no evidence that Rabbi Josilowsky even was aware of Issac's knowing failure to appear in the Arbitration.

Josilowsky concluded that "[a]n obvious miscarriage of justice takes place when a judicial hearing is held without the presence of both

parties." DKT.67-1 ¶7. That general principle applies under Halachic law, as it does pursuant to secular law throughout the United States. However, as with secular law, Halachic law recognizes that a party cannot avoid a civil judgment merely by refusing to appear, as Issac did here. DKT.63-1 ¶¶10–11. Under those circumstances—which Josilowsky did not consider—a rabbinical panel (like a secular court) may enter a judgment against a recalcitrant respondent. Josilowsky did not refute that principle.

Halachic law, like most arbitral rules, affords respondents even greater protection by prohibiting tribunals from entering default judgments. DKT.63-1 ¶11. Pursuant to Halachic law, the rabbinical panel must consider record evidence, apply Halachic law, and enter a well-reasoned award on the merits. *Id*. The Panel did so here and even ruled in Issac's favor on an issue despite his failure to appear. DKT.51-1 at 13.

***Second***, the District Court's consideration of the Panel's jurisdiction should have started and ended with the Award, wherein the Panel concluded that it had jurisdiction based on its analysis of Paragraph 16 under Halachic law.

The District Court's most critical function was to effectuate the parties' intent in Paragraph 16. *See JPay, Inc. v. Kobel*, 904 F.3d 923, 929 (11th Cir. 2018) (obligation of courts is to enforce arbitral agreement); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 n.8 (2010) (obliged to enforce arbitral agreement "according to its terms") (quotation omitted).

The District Court should have deferred to the Panel's holding concerning its jurisdiction because the Panel qualified as an arbitrator pursuant to Paragraph 16; the question of jurisdiction was within its contractually delegated authority; and the parties expressly agreed that no other tribunal would be authorized to interpret the Panama Agreement.

Paragraph 16 expressly delegates all aspects of any dispute between the parties to an arbitrator, to the express exclusion of all other jurisdictions, including the District Court. DKT.51-1 at 24, ¶16 (beginning "In the event of any difference or dispute as to the performance, interpretation, execution, and/or scope of this document . . ." and ending "waiving any other recourse in any jurisdiction").

The Panel was a qualified arbitral panel pursuant to Paragraph 16,

wherein the parties delegated all questions to a tribunal employing "the ***methods*** in effect for members of the in effect for members of the Israeli Charitable Society *Shevet Ahim*." *Id.* (emphasis added). As the Panel held, "the methods in effect for members of the Israeli Charitable Society *Shevet Ahim*" include arbitration "by a *Beis Din*, a tribunal composed of three ordained Rabbis versed in *Halacha*." DKT.51-1 at 3.[4]

Issac confirmed this point below. In his First Declaration, he attested that the "only alternative dispute resolution methods in effect for members of [*Shevet Ahim*]" include "mediation and arbitration before **a** Rabbinical court," DKT.25-1 ¶¶28 (emphasis added), and that he had agreed to "arbitration before a Rabbinical court" and "religious

[4] Issac's argument that the phrase "the methods in effect for members of the Israeli Charitable Society *Shevet Ahim*" means that any arbitration must be before the *Shevet Ahim* in Panama is based on his self-serving lay opinion. It renders the phrase "methods in effect" meaningless. DKT.29-1 ¶28; *Titan Corp. v. Support Sys. Assocs.*, 315 F. App'x 870, 872 (11th Cir. 2009) (court must interpret contract "in a way that does not render any portion of it meaningless"). Paragraph 16 does not refer to Panama nor does it state that *Shevet Ahim* in Panama must arbitrate the dispute. It binds the parties to the "***methods*** in effect for members" of *Shevet Ahim*, DKT.51-1 at 24 (emphasis added), which, as the Panel held, refers to arbitration before a rabbinical panel pursuant to Halachic law, and not to the location of the presiding *Beis Din*. *Id.* at 3. Issac confirmed below that Paragraph 16 requires "arbitration before ***a*** Rabbinical court." DKT.25-1 ¶20 (emphasis added); *supra* note 3.

arbitration." *Id.* ¶¶28, 31-32; *supra* note 3. The Arbitration at issue here was before a Rabbinical court conducting religious arbitration. DKT.51-1 at 2.

Issac did not deny, and thereby admitted, Salomon's allegation that "the parties agreed in paragraph 16 of the [Panama] Agreement to an alternative dispute resolution method pursuant to Halacha law." DKT.51 ¶3, 59; *Argos Glob. Partner Servs., LLC v. Ciuchini*, 446 F. Supp. 3d 1073, 1077 (S.D. Fla. 2020) (uncontradicted jurisdictional allegations "must be accepted as true").

In addition to stating their intent to arbitrate before a tribunal that met the qualifications in Paragraph 16, the parties were equally clear that they did not want any other court or tribunal to interpret Paragraph 16, including the District Court. DKT.51-1 at 24, ¶16 (delegating all issues to tribunal and "waiving any other recourse in any jurisdiction"). When, as here, the parties have delegated arbitrability to the arbitrator, the party resisting confirmation of the award "is not entitled to an independent judicial redetermination of that same question." *Schneider v. Kingdom of Thailand*, 688 F.3d 68, 74 (2d Cir. 2012); *Olin Holdings Ltd. v. State of Libya*, 73 F.4th 92, 107 (2d Cir. 2023) (because parties

"clearly and unmistakably agreed to submit issues of arbitrability to the Tribunal" Libya not entitled to de novo judicial review); *Henry Schein,* 139 S. Ct. at 529 ("court possesses no power to decide the arbitrability issue" if delegated to arbitrator).

***Third***, even under U.S. law, Issac waived his right to contest the Panel's jurisdiction by refusing to appear in the Arbitration and object to the Panel's jurisdiction. This Court and others have held that the failure to challenge an arbitral panel's jurisdiction waives the ability to challenge that jurisdiction in court on confirmation. *See Shopmen's Loc. 539 v. Mosher Steel,* 796 F.2d 1361, 1365 (11th Cir. 1986) (failure to challenge arbitrator's ruling precludes raising in enforcement); *Hicks v. Bank of Am.*, 218 F. App'x 739, 746 (10th Cir. 2007) (respondent waived objection to arbitrator's personal jurisdiction by failing to raise with arbitrator); *Vital Pharm. v. Pepsico, Inc.,* 528 F. Supp. 3d 1304, 1310 (S.D. Fla. 2020) (same); *Langlais v. Pennmont Benefit Servs.*, 527 F. App'x 215, 219 (3d Cir. 2013) (party must present procedural issues to arbitrator "rather than save them" for court); *see also Your CBD Stores Franchising, LLC v. Buckwalter*, No. 8:23-cv-1550-VMC-AAS, 2023 U.S. Dist. LEXIS 183330, at *17–18 (M.D. Fla. Oct. 12, 2023) (due process not violated in

absence of party refusing to attend). That principle applies when, as here, the party fails to appear altogether. *See IBEW, Loc. Union No. 545 v. Hope Elec. Corp.*, 380 F.3d 1084, 1099 (8th Cir. 2004) (party refused to participate in arbitration waived challenges to arbitrability); *Dean v. Sullivan*, 118 F.3d 1170, 1172 (7th Cir. 1997) (refusing to appear in arbitration and attacking panel's composition in court is "sandbagging").

Rather than enforce the parties' undisputed intent by deferring to the judgment of a tribunal that fit squarely within the parameters set forth by the parties in Paragraph 16, the District Court improperly imposed its own, conflicting interpretation of Paragraph 16. DKT.92 at 26–34. It should have deferred to the Panel's findings, including with respect to the Panel's own jurisdiction, because the Panel interpreted Paragraph 16 and determined that it had jurisdiction. *Supra* note 3; *Bamberger Rosenheim, Ltd. (Isr.) v. OA Dev., Inc.*, 862 F.3d 1284, 1288 (11th Cir. 2017) (review of arbitrator's venue determination "is limited to 'whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong'") (citation omitted); *Gherardi v. Citigroup Glob. Mkts., Inc.*, 975 F.3d 1232, 1237 (11th Cir. 2020) (same); *Spirit of the E., Ltd. Liab. Co. v. Yale Prods.*, No. 22-13122,

2023, U.S. App. Lexis 8604, at *15 (11th Cir. Apr. 11, 2023) ("arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits.").

The District Court erred in holding that it lacked personal jurisdiction over Issac to enforce the Award.

## II. RESPONDENT IS SUBJECT TO PERSONAL JURISDICTION PURSUANT TO 9 U.S.C. § 9

Isaac's challenge to personal jurisdiction below is resolved by the straight-forward application of 9 U.S.C. § 9 to the undisputed facts. Section 9 provides: "If no court is specified in the agreement of the parties," then "the district within which [the arbitration] award was made" shall, upon notice to the respondent, "***have jurisdiction of such party as though he had appeared generally in the proceeding***." 9 U.S.C. § 9 (emphasis added); *McGregor & Werner, Inc. v. Motion Picture Lab. Technicians Loc.*, 806 F.2d 1003, 1005 (11th Cir. 1986) (agreement did not specify court for review of arbitration award, thus jurisdiction proper in district court where award was made); *PTA-FLA, Inc. v. ZTE USA, Inc.*, No. 3:11-cv-510-J- 32JRK, 2015 U.S. Dist. LEXIS 187448, at *22 (M.D. Fla. Aug. 5, 2015) (Section 9 jurisdiction available upon proper service); *Amazon.com, Inc. v. Glenn*, 2018 U.S. Dist. LEXIS 193499, at

*2–4 (W.D. Wash. Nov. 13, 2018) (Section 9 jurisdiction over extraterritorial respondent who did not participate in the arbitration); *Hausman v. Earlswood Enters.*, 95 Civ. 9088 (JSM), 1996 U.S. Dist. LEXIS 13428, at *16 (S.D.N.Y. Sep. 11, 1996) (same).[15]

The District Court should have exercised Section 9 jurisdiction over Respondent because it was undisputed below that: **(1)** the Panama Agreement does not specify the court that may enter a judgment on the Final Award, DKT.51-1 at 24¶16; **(2)** the Panel entered the Final Award in this District, *id.* at 16; and **(3)** Petitioner properly served Respondent with notice of this action. ECF No. 47 (admitting adequate service and withdrawing Second Motion to Quash).

The District Court declined to exercise Section 9 jurisdiction based on its finding that Salomon failed to satisfy "Section 9's first requirement—that the parties consented to judicial confirmation of their arbitral award." DKT.92 at 39. The District Court's holding was erroneous because the Conventions preempt and eliminate Section 9's consent to jurisdiction requirement. By disregarding this well-established principle, the Court erroneously foreclosed jurisdiction that Congress intended courts to exercise in precisely this scenario. Reversal

is required.

Even if the consent to jurisdiction requirement applied in Convention cases, Salomon established that Isaac *did* consent to judicial confirmation of the Award by agreeing that Halachic Law would govern the parties' disputes, just as parties consent to confirmation by agreeing to submit their disputes to AAA arbitration.[5] Indeed, in addition to his explicit admissions that the parties agreed Halachic law would govern, Isaac did not contest (and thus admitted for jurisdictional purposes) that "the rules of procedure governing the arbitration state that 'Parties to these Rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any Federal or state court having jurisdiction thereof.'" DKT.51¶15; *Argos*, 446 F. Supp. 3d at 1077

[5] Section 9's consent-to-confirmation requirement is satisfied where the parties have agreed that their disputes will be resolved pursuant to rules that include a consent-to-confirmation provision or consent to a forum applying such rules. *See Ghaly v. Sun Pack & Ship, Inc.*, No. 6:24-cv-629-CEM-UAM, 2025 U.S. Dist. LEXIS 6201, at *5 (M.D. Fla. Jan. 13, 2025) (citing cases, approach adopted by the Second, Fourth, Fifth, Seventh, Tenth circuits). Here, the parties agreed that Halachic law would govern the arbitral disputes, *supra* note 3, and it was undisputed that Halachic law includes a consent-to-confirmation requirement. DKT.63-1 ¶¶14-15; *supra* pp. 25-29 (addressing Isaac's failure to rebut Halachic law principles); DKT.1-1 at 3 (Panel holding: "Once the Beis Din has issued a ruling on the substance of the claims, the ruling may be filed in the Civil Court system to enforce the Beis Din's ruling" and citing Halachic law).

(uncontradicted jurisdictional allegations "must be accepted as true").

### A. The District Court Erred by Imposing A "Consent-To-Confirmation" Requirement On Section 9 in an Action Brought Pursuant to the Panama Convention

The District Court held that "[S]ection 9 . . . conditions jurisdiction over a party on both parties' agreement that judgment will be entered upon the award," concluding that "[t]he agreement here . . . contains no such provision." DKT.92 at 40 (citation omitted). But imposing this consent-to-confirmation requirement on Convention awards creates an improper procedural obstacle directly at odds with the streamlined confirmation procedures Congress adopted in Section 207 and the pro-enforcement policy underlying the Conventions. *See Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974) (goal of Convention to encourage enforcement of international awards); *Phoenix*, 391 F.3d at 435 (same).

Section 9 conditions confirmation of an arbitral award upon the parties' advance consent to judicial confirmation, stating that parties must have "agreed that a judgment of the court shall be entered upon the award." 9 U.S.C. § 9. In contrast, Sections 207 and 307, governing enforcement actions under the New York and Panama Conventions,

contains no such consent requirement. Instead, Section 207 explicitly provides that a district court "shall confirm" an arbitral award upon timely application, unless narrow and enumerated grounds for refusal apply. 9 U.S.C. § 207. Thus, while Section 207 makes confirmation presumptively mandatory for either Convention without requiring consent to confirmation, Section 9 imposes an additional, more restrictive precondition.

This divergence creates a direct conflict: Section 9's consent-to-confirmation requirement would limit confirmation of Convention arbitral awards in a manner that Section 207 expressly avoids. Section 207, by design, is a streamlined procedural mechanism that deliberately excludes any requirement of advance party consent in order to simplify and accelerate enforcement of Convention awards. This reflects the clear Congressional intent to eliminate barriers to enforcement of international awards. By contrast, Section 9's consent requirement was enacted with a distinct purpose: to ensure that the parties "affirmatively agreed to the application of the federal substantive law contemplated by the [FAA] to the interpretation of the arbitration agreement into which they have entered." *Phoenix*, 391 F.3d at 436 (citation omitted). This

rationale—grounded in ensuring parties' consent to substantive FAA law—is inapplicable in Convention proceedings because Section 207 independently governs confirmation of international arbitration awards.

Applying Section 9's consent clause here would impose precisely the kind of procedural burden Congress sought to avoid, obstructing the uniform recognition of international arbitral awards envisioned by the Conventions. Because Sections 208 and 307 expressly mandate that conflicting Chapter 1 provisions cannot apply when they impede enforcement under either Convention, the District Court erred in importing a consent-to-confirmation requirement from Section 9 into this proceeding.

The Second, Fourth, and Fifth Circuits have addressed the conflict between Section 9's consent-to-confirmation clause and the Conventions' confirmation procedures. In *Phoenix*, the Second Circuit held that "§ 207 preempts § 9's consent-to-confirmation requirement in cases under the [the New York] Convention," because the New York Convention's own confirmation provision contains no parallel consent requirement. 391 F.3d at 436; *Stone & Webster, Inc. v. Triplefine Int'l Corp.*, 118 F. App'x 546, 549 (2d Cir. 2004) (following *Phoenix*). In *McDermott*, the Fifth

Circuit determined that Section 9's consent clause "clearly" conflicts with Section 207 and thus refused to apply that clause in Convention enforcement proceedings. 120 F.3d at 588–89 & n.12. The Fourth Circuit adopted *Phoenix* in *First Kuwaiti Gen. Trading & Contracting W.L.L. v. Kellogg Brown & Root Int'l, Inc.*, 141 F.4th 522, 529 (4th Cir. 2025).

These holdings reflect the statutory command of §§ 208 and 307, requiring that conflicting Chapter 1 provisions yield to the Conventions. Because Section 207 does not condition confirmation upon explicit party consent, the contrary requirement in Section 9 is pre-empted. Severing the conflicting clause from Section 9 thus harmonizes the FAA's statutory framework with the Conventions' simplified enforcement procedures. No circuit has held otherwise. The District Court's refusal to follow this settled approach was error.

Multiple district courts have recognized precisely what the district court rejected here: Section 9's jurisdictional mechanism remains fully operative in domestic proceedings and in Convention enforcement proceedings once conflicting provisions are severed. *PTA-FLA, Inc. v. ZTE USA, Inc.*, No. 3:11-cv-510-J-32JRK, 2015 WL 12819186, at *5 (M.D. Fla. Aug. 5, 2015) (Section 9 provides means for obtaining personal

jurisdiction for confirmation); *Amazon.com, Inc. v. Glenn*, No. C18-1289-MJP, 2018 WL 5921005, at *1–2 (W.D. Wash. Nov. 13, 2018) (exercising jurisdiction per Section 9 over extraterritorial respondent who failed to participate in arbitration); *Hausman v. Earlswood Enters.*, No. 95 CIV. 9088 JSM, 1996 WL 527335, at *6 (S.D.N.Y. Sep. 16, 1996) (jurisdiction over foreign respondent); *New Skies Satellites B.V. v. Gospel Ministries Int'l*, No. 1:15-CV-27, 2016 WL 11506970 (E.D. Tenn. Apr. 5, 2016) (adopting *Phoenix;* consent-to-confirmation requirement in Section 9 conflicts with Section 207).

The District Court's reliance on *Home Ins. Co. v. RHA/Pa. Nursing Homes* and *Idea Nuova, Inc. v. GM Licensing Group*, is misplaced. Those cases addressed purely domestic arbitrations pursuant to Section 9, where no conflict with the Conventions was presented. 113 F. Supp. 2d 633, 634 (S.D.N.Y. 2000); 617 F.3d 177, 180 (2d Cir. 2010).[6]

The District Court failed to recognize the critical distinction

[6]Issac's reliance on *Sonera Holding B.V. v. Cukurova Holding A.S.* 750 F.3d 221, 226–27 & n.3 (2d Cir. 2014), and *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1121 (9th Cir. 2002), is misplaced. Those courts held that the Conventions do not confer personal jurisdiction independently. They did not address Section 9.

between Convention cases, where partial pre-emption of conflicting clauses in Chapter 1 of the FAA occurs, and domestic arbitration cases governed exclusively by Section 9. This misstep wrongly led the Court to disregard persuasive precedent supporting Salomon's position.

### B. Nothing in the FAA or Convention Prevents Severing Section 9's Conflicting Consent Provision

Partial pre-emption is an established approach under the FAA and the Conventions. *See Phoenix*, 391 F.3d at 437–38; *McDermott*, 120 F.3d at 588–89. Pursuant to 9 U.S.C. §§ 208 and 307, only provisions inconsistent with the Convention yield to its international standards; the remainder remain intact and operative. Section 9's jurisdictional elements—focusing exclusively on proper notice and the local issuance of the arbitral award—present no conflict with Section 207, and thus remain applicable once the consent-to-confirmation requirement is severed.

In rejecting this approach, the District Court reasoned that because Section 207 does not explicitly confer personal jurisdiction, "ordinary personal jurisdiction requirements remain in full force and effect." DKT.92 at 41 (citing *Glencore Grain*, 284 F.3d at 1121; *Base Metal*, 283 F.3d at 212). This reasoning is contrary to every other decision that has

addressed the issue. It also overlooks that Section 9 itself independently provides a statutory jurisdictional mechanism consistent with these ordinary constitutional requirements, conditioned explicitly on proper notice and local issuance of the award—conditions undisputedly satisfied here. Thus, the District Court's insistence that Salomon seek jurisdiction outside the FAA unnecessarily misapplied the principle of partial pre-emption and created a jurisdictional obstacle unsupported by the statute's plain text or controlling precedent.

Confirming jurisdiction under these circumstances serves not only justice, but also directly advances the Convention's core objective: simplifying recognition and enforcement of international arbitration awards. Affirming jurisdiction thus aligns precisely with congressional intent, promotes international comity, and ensures fairness by precluding jurisdictional gamesmanship.

### C. Section 9 is Constitutionally Sound under the Fifth Amendment

Once Section 9 applies, the respondent is deemed have appeared generally thus automatically conferring personal jurisdiction. 9 U.S.C. § 9. And, Section 9 is constitutionally sound. When, as here, personal jurisdiction rests on a federal statute, the Fifth Amendment applies. The

Supreme Court recently clarified in *Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025), that the Fifth Amendment does not import the Fourteenth Amendment's minimum-contacts test into federal personal jurisdiction analysis. The Court explained that the Fourteenth Amendment's limits are rooted in "interstate federalism" and State territorial sovereignty—concerns that "do not apply to limitations under the Fifth Amendment upon the power of the Federal Government and the corollary authority of the federal courts." *Id.* at 14–16. The Fifth Amendment permits "a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Id.* at 16. Section 9 fits within this framework: it provides that when no confirming court is specified, "application may be made to the United States court in and for the district within which such award was made," and that, once notice is served, "the court shall have jurisdiction of such party as though he had appeared generally in the proceeding." 9 U.S.C. § 9. By anchoring jurisdiction in the seat of the arbitration and the provision of notice, Section 9 reflects the kind of straightforward statutory nexus *Fuld* recognized as constitutionally sufficient. *See* 606 U.S. at 16–17, 23–25. Thus, applying Section 9 is constitutionally secure and minimum

contacts are inapplicable.

## III. THE DISTRICT COURT HAD PERSONAL JURISDICTION OVER RESPONDENT UNDER RULE 4(k)(2)

Federal Rule of Civil Procedure 4(k)(2) provides precisely the jurisdictional solution intended for a case such as this: enforcement proceeding pursuant to the Panama Convention against a foreign respondent whose numerous and longstanding contacts span the United States. The District Court correctly recognized that this proceeding arises under federal law (DKT.92 at 36), and that Issac did not identify any state where he would be subject to general jurisdiction. Yet, the court erroneously concluded that his pervasive U.S. ties failed the due-process inquiry, applying the heightened standard from *Daimler AG v. Bauman*, 571 U.S. 117, 138–39 (2014)—a case focused on plenary, liability-imposing litigation rather than summary arbitration enforcement. Because Rule 4(k)(2) required the court to evaluate Issac's contacts with the United States as a whole, and because the constitutional threshold for personal jurisdiction is meaningfully lower for arbitration enforcement, the District Court should be reversed.

### A. Rule 4(K)(2) Jurisdiction Addresses Situations Where the Foreign Respondent Has Pervasive Contacts with the United States but Not to a Single State

Rule 4(k)(2) was enacted to address the jurisdictional gap arising when a foreign defendant engages consistently with the United States yet avoids maintaining jurisdiction-triggering contacts in any specific state. Fed. R. Civ. P. 4(k)(2).

The District Court correctly acknowledged that Rule 4(k)(2)'s first two statutory elements are satisfied here: (1) this proceeding arises under federal law; and (2) Issac, a Panamanian national, is not subject to general jurisdiction in any individual state. DKT.92 at 36. Isaac did not identify an alternative forum state in which he could be sued, conceding this element. Thus, the only issue was whether exercising jurisdiction over him based on his aggregate national contacts satisfied constitutional due-process standards.

### B. Respondent's Multifaceted Contacts with the United States Meet Constitutional Requirements

Issac's extensive and sustained interactions with the United States span multiple decades and cover a wide array of purposeful activities easily surpassing constitutional minimums for jurisdiction under Rule 4(k)(2). The record demonstrates continuous and systematic engagement:

- **Long-term real estate ownership and use:** He and his wife's purchase of the Miami Home in 2009, DKT.51 ¶¶18–19, deeded to NMB Aventura, a single-purpose entity owned and controlled by Isaac. DKT.58-1 ¶13; DKT.63-2; DKT.63-3. It continues to serve as his primary Florida residence, and is managed by his Florida-based attorney. DKT.85-1 at 20:13–21:8. He holds an equitable interest in the Miami Home through his ownership of NMB Realty. DKT.83-3; DKT.83-4; DKT.85-1 at 38:14–16, 39:8–40:9.
- **Significant financial and investment activities:** Isaac maintains banking relationships in Florida, financial assets at JPMorgan in the United States, including a bank account and a brokerage account for holding securities. DKT.58-1 at 2–3 (¶¶17); DKT.51 ¶22; DKT.63-5 at 46:1–47:10. Isaac employs and contracts with investment advisors in Florida. DKT.63-5 at 41:24–42:2, 42:18–43:23, Ex. 11. He has sent and received business communications from Florida. DKT.63-5 at 64:3–5. He holds a beneficial interest in a Northern Trust property management account in Miami, maintained and controlled by Reinhard, through which all bills for the Miami Home are paid. DKT.85-1 at 26:8–

28:17, 47:5–19; DKT.51 ¶¶21–22. Reinhard also retains in Miami the original stock certificates for NMB Realty. DKT.85-1 at 38:23–39:4, 39:21–25.

- **Extensive domestic travel for business and personal purposes:** Isaac has traveled to the United States more than seventy times over the past eighteen years, substantially to Florida. DKT.51 ¶¶24–25; DKT.63-5, Ex. 15. He maintains a local Florida cell phone number, DKT.58-1 ¶19, and donates to and attends a synagogue in Miami. DKT.51 ¶26; DKT.58-1 at 4(¶20).
- **Prominent philanthropic involvement:** Isaac engages in significant philanthropic endeavors within the United States, including the Chabad at Tulane University. DKT.51 ¶33; DKT.58-1 at 4 (¶21). He has naming rights, such as the "Btesh Family Chabad House" at Tulane. DKT.51 ¶33. He donates to and attends a synagogue in Miami. DKT.51 ¶26; DKT.58-1 at 4(¶20).
- **Publication and nationwide distribution of a U.S.-registered book:** Issac authored and obtained a U.S. copyright for "The Pharaoh's Dream," sold nationwide. DKT.51 ¶34; DKT.58-1 at 3 (¶¶10–11). He actively markets and earns revenue from it within

the United States. DKT.58-1 at 3 (¶¶10–11).

Respondent's contacts collectively exceed the constitutional threshold, particularly in the streamlined context of a summary arbitration enforcement proceeding. *See Shaffer*, 433 U.S. at 210 n.36; *CME Media Enters. B.V. v. Zelezny*, No. 01 Civ. 1733 (DC), 2001 WL 1035138, at *3–4 (S.D.N.Y. Sept. 10, 2001); *Sequip Participações S.A. v. Marinho*, No. 15-23737-MC, 2018 WL 10593628, at *6–7 (S.D. Fla. Oct. 16, 2018); *Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836, 842 (11th Cir. 2011).

### C. The District Court Erroneously Applied *Daimler*'s Restrictive Due-Process Framework for Plenary Actions to This Summary Enforcement Proceeding

The District Court's rejection of Rule 4(k)(2) jurisdiction rests on a fundamental doctrinal misapplication: it extended *Daimler*'s stringent general jurisdiction test—crafted for plenary litigation—to a streamlined arbitration enforcement action. *Daimler* explicitly addressed general jurisdiction over corporate defendants in plenary proceedings, involving questions of liability and intensive factual adjudication. *See Daimler AG v. Bauman*, 571 U.S. 117, 138–39 (2014). That heightened jurisdictional standard never has governed summary proceedings designed merely to

confirm already-rendered arbitral awards.

This distinction is vital. In *Shaffer v. Heitner*, the Supreme Court expressly recognized that due-process concerns are significantly diminished in enforcement actions precisely because the merits of the underlying claim have already been adjudicated:

> Once it has been determined by a court of competent jurisdiction that the defendant is a debtor of the plaintiff, there would seem to be no unfairness in allowing an action to realize on that debt in a State where the defendant has property, whether or not that State would have jurisdiction to determine the existence of the debt as an original matter.

433 U.S. 186, 210 n.36 (1977).

Federal courts consistently have recognized that jurisdictional inquiries for enforcement proceedings are less stringent because no new liability determination is at stake. *See Shaffer*, 433 U.S. at 210 n.36; *CME Media Enters. B.V. v. Zelezny*, No. 01 Civ. 1733 (DC), 2001 WL 1035138, at *3–4 (S.D.N.Y. Sept. 10, 2001) ("Minimum contacts are not required [for *quasi in rem* jurisdiction] because an arbitration panel with personal jurisdiction over [respondent] has already adjudicated [petitioner's] claims against [respondent] and determined that he is a debtor of [petitioner]").

The District Court relied erroneously on *Sonera Holding B.V. v.*

*Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014), for the proposition that courts routinely apply *Daimler* to summary enforcement proceedings under the Convention. DKT.92 at 22. But *Sonera* neither addressed Rule 4(k)(2) nor considered the distinctions identified in *Shaffer* between plenary actions and summary proceedings limited to confirming arbitral awards. *Sonera* provides little support for extending *Daimler* into the fundamentally different context of a Convention enforcement action.

Here, the District Court's rigid application of *Daimler*, without acknowledging the fundamental distinctions articulated in *Shaffer*, represents precisely the type of doctrinal error against which the Supreme Court warned. By applying *Daimler*'s heightened standard—intended for plenary litigation—to this arbitration enforcement context, the District Court disregarded controlling Supreme Court precedent and established federal practice recognizing the reduced constitutional scrutiny required in summary confirmation proceedings.

Multiple decisions within this Circuit confirm that summary enforcement proceedings pursuant to the Convention justify exercising general jurisdiction under either Rule 4(k)(2) or state long-arm statutes,

even post-*Daimler*, because constitutional due process concerns are significantly reduced compared to plenary litigation. In *Sequip Participações S.A. v. Marinho*, the Southern District of Florida found general jurisdiction appropriate in a summary arbitration enforcement proceeding governed by the Convention—even though the respondent was domiciled abroad—based on his extensive, continuous, and systematic contacts with Florida, including frequent travel, property ownership, substantial financial investments, and prior litigation in the state. No. 15-23737-MC, 2018 WL 10593628, at *6–7 (S.D. Fla. Oct. 16, 2018). Although the court's analysis arose under Florida's long-arm statute for purposes of long-arm jurisdiction, the decision underscores that general jurisdiction can be proper for enforcement actions when a respondent's local contacts demonstrate a fair expectation of defending against summary proceedings in that jurisdiction. *Id.*

Likewise, this Circuit emphasized in *Cat Charter* that judicial review of arbitration awards pursuant to the FAA—including enforcement actions governed by the Convention—ordinarily should be "routine or summary," given the FAA's "heavy presumption in favor of confirming arbitration awards." 646 F.3d at 842 (internal quotation

omitted). Unlike plenary litigation, arbitration confirmation proceedings do not re-litigate liability but focus narrowly on recognizing and enforcing the arbitrators' already-rendered decision. *Id.* at 842, 845–46.

Other circuits and district courts likewise have recognized that jurisdictional requirements are diminished in arbitration enforcement actions precisely because these proceedings do not establish liability but rather seek to enforce an existing liability. The Ninth Circuit similarly has recognized that jurisdictional standards in award-confirmation actions are meaningfully lower due to their inherently limited, non-plenary nature. *See Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1127–28 (9th Cir. 2002). And, in *CME Media Enterprises B.V. v. Zelezny*, the Southern District of New York specifically emphasized that minimum contacts are not required because arbitration enforcement proceedings involve merely collecting on a debt already adjudicated. 2001 WL 1035138, at *3–4 (S.D.N.Y. Sept. 10, 2001).

In declining to exercise jurisdiction here, however, the District Court incorrectly relied on authorities involving plenary litigation that imposed the restrictive *Daimler* domicile test without regard to the summary enforcement context. The court relied on cases like *Thompson*

*v. Carnival Corp.*, 174 F. Supp. 3d 1327, 1338 n.9 (S.D. Fla. 2016), and *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 462 (9th Cir. 2007), which address general jurisdiction in the context of *plenary proceedings*. Those decisions do not address the uniquely reduced constitutional scrutiny applicable in arbitration enforcement actions.

Exercising jurisdiction pursuant to Rule 4(k)(2) in this arbitration enforcement action advances the primary federal policy goal of the Panama Convention and the FAA: to promote the efficient recognition and enforcement of international arbitration awards. The District Court's restrictive application of Rule 4(k)(2) undermines this fundamental policy by creating jurisdictional obstacles precisely where Congress intended streamlined enforcement. Because the District Court's exercise of jurisdiction under Rule 4(k)(2) fully satisfies constitutional due-process requirements in the context of summary arbitration enforcement, reversal will advance the Convention's mandate of providing efficient judicial enforcement of international arbitration awards.

### D. Requiring a Full Minimum Contacts Analysis for Arbitration Enforcement under Rule 4(k)(2) would Contradict U.S. Treaty Obligations

Imposing a stringent minimum contacts requirement in arbitration enforcement proceedings would conflict with the simplified procedural mandates of the Panama and New York Conventions and contravene the intent behind Rule 4(k)(2). "The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to . . . unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974). To fulfill this goal, the Convention limits available defenses against enforcement to a finite and explicitly enumerated list, deliberately excluding additional procedural hurdles such as heightened personal jurisdiction requirements. *See* Convention, Art. V; *see also Commodities & Minerals Enter. v. CVG Ferrominera Orinoco, C.A.*, 49 F.4th 802, 809 (2d Cir. 2022) (Article V "contains an exhaustive list of seven defenses to confirmation"); *Karaha Bodas Co. v. Perusahaan Pertambangan*, 364 F.3d 274, 287 (5th Cir. 2004) ("[C]ourts in countries of secondary jurisdiction may refuse enforcement only on the grounds specified in Article V.").

Article III of the Convention requires that "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon." Convention, Art. III. This procedural flexibility is limited to methods or mechanisms of enforcement—filing fees, time periods, legal representation, and judicial venue—not substantive conditions like minimum contacts. *See* G. B. Born, *Int'l Comm. Arb.* § 26.02 (Kluwer Law Int' 3d ed. 2024) (Article III concerns procedural aspects of recognition). Thus, Article III cannot plausibly be interpreted to permit the imposition of a domestic personal jurisdiction standard, such as minimum contacts, which is substantive rather than procedural. *See Figueiredo Ferraz e Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384, 399 (2d Cir. 2011) (Lynch, J., dissenting) (Article III procedural provisions "do not provide a means by which a state may decline to enforce such awards at all"); van den Berg, *The New York Arbitration Convention of 1958: Towards a Uniform Judicial Interpretation* 239 (1981) (Article III addresses procedural form, not substantive conditions for enforcement).

Permitting states to impose full minimum contacts jurisdictional standards substantially would reduce the international mobility of

arbitral awards, directly undermining the core purpose of the Convention: efficient, uniform enforcement across jurisdictions. Such a jurisdictional barrier would allow states to use domestic jurisdictional principles as a "backdoor escape" to deny recognition and enforcement of legitimate foreign awards, something Article III explicitly prohibits. *See* Park & Yanos, *Treaty Obligations & National Law: Emerging Conflicts in International Arbitration*, 58 Hastings L.J. 251, 255–56 (2006) (Article III not allow states to evade enforcement obligations through procedural rules).

Conditioning enforcement on minimum contacts—standards appropriate only for plenary litigation—not only would frustrate the Convention's streamlined enforcement scheme but would place the United States in breach of its treaty obligations.

## IV. THE DISTRICT COURT ERRED IN REFUSING TO EXERCISE *QUASI IN REM* JURISDICTION

The District Court's refusal to exercise *quasi-in-rem* jurisdiction was in error for several reasons. *First*, the *Shaffer* eliminated the need for further minimum contacts analysis. *Second*, the Panel, having exercised personal jurisdiction in the arbitration and rendered an award, plainly constitutes a "court of competent jurisdiction" under the

established *Shaffer* framework and consistent with every court to address the issue. *Third*, the Award has the same force and effect as a judicially rendered judgment, with no prerequisite that it first be confirmed by a separate court. *Fourth*, Issac's acknowledgment of multiple, specifically identified Florida assets satisfies the jurisdictional predicate for *quasi in rem* type II relief. The District Court's contrary conclusions are incompatible with authoritative law and the strong federal policy favoring streamlined enforcement of international arbitral awards.

### A. The *Shaffer* Exception Eliminates Any Minimum-Contacts Requirement

In *Shaffer*, the Supreme Court affirmed that, when property unrelated to the plaintiff's cause of action serves as the sole basis for jurisdiction, as may be the case with *quasi in rem* jurisdiction, the minimum contacts case set forth in *International Shoe* and its progeny must be satisfied. 433 U.S. 186, 210–13 (1977). However, *Shaffer* also created an exception to that rule by holding that the minimum contacts analysis does not apply when a "court of competent jurisdiction" already has entered a judgment against the defendant and the court merely is being called upon to enforce the judgment (the "*Shaffer* Exception"). *Id.*

at 45.

This framework directly informs so-called *quasi in rem* type II jurisdiction, which permits a court to subject a respondent's identified property to the satisfaction of claims regardless of the respondent's "presen[ce] in the district"; all that is required is a good-faith allegation that the respondent owns property within the forum. *See World Wide Supply Ou v. Quail Cruises Ship Mgmt.*, 802 F.3d 1255, 1260 (11th Cir. 2015); *Cerner Middle E. v. Icapital*, 2021 U.S. Dist. LEXIS 206304, at *8 (D. Or. Aug. 23, 2021) (property may form basis for jurisdiction "even if that property has no relationship to the underlying controversy between the parties"); *CME Media Enters. B.V. v. Zelezny*, 01 Civ. 1733 (DC), 2001 U.S. Dist. LEXIS 13888, at *9 (S.D.N.Y. Sep. 10, 2001) (exercising *quasi in rem* jurisdiction to enforce arbitral award against property).

Federal courts regularly apply the *Shaffer* Exception to allow the enforcement of final arbitral awards without engaging in a minimum-contacts analysis. *See, e.g.*, *Glencore,* 284 F.3d at 1118 ("Considerable authority supports Glencore Grain's position that it can enforce the [arbitral] award against Shivnath Rai's property in the forum even if that property has no relationship to the underlying controversy between the

parties."); *CME*, 2001 U.S. Dist. LEXIS 13888, at *9 (S.D.N.Y. Sep. 10, 2001) ("Here, the Court has quasi in rem jurisdiction because respondent maintains property, specifically, the Account, in this District. Minimum contacts are not required because an arbitration panel with personal jurisdiction over Zelezny has already adjudicated CME's claims against Zelezny and determined that he is a debtor of CME; the purpose of the instant proceeding is to collect on that debt.") (emphasis added) (internal citation omitted); *Equipav S.A. Pavimentação, Engenharia e Comercio Ltda. v. Bertin*, 2024 U.S. Dist. LEXIS 9222, at *18 (S.D.N.Y. Jan. 18, 2024) (applying *Shaffer* Exception to find *quasi in rem* jurisdiction to enforce arbitral award); *La Dolce Vita Fine Dining Co. v. Zhang Lan*, No. 21-cv-3071 (LAK), 2023 U.S. Dist. LEXIS 23196, at *5 (S.D.N.Y. Feb. 10, 2023) ("Given that an arbitration panel with personal jurisdiction over Zhang already adjudicated Petitioners' claims and concluded that Zhang (and the other Arbitral Respondents) owe Petitioners $142 million, this Court may exercise *quasi in rem* jurisdiction without requiring the existence of minimum contacts."); *Gov't of the Lao People's Democratic Republic v. Baldwin*, No. 2:20-cv-00195-CRK, 2021 U.S. Dist. LEXIS 224212, at *21 (D. Idaho Nov. 19, 2021) (*Shaffer* exception "applies to the

enforcement of arbitral awards"); *Bunge S.A. v. Pac. Gulf Shipping (Singapore) Pte Ltd.*, No. 3:19-cv-00491-SB, 2020 U.S. Dist. LEXIS 56169, at *4 (D. Or. Mar. 31, 2020) (*quasi in rem* jurisdiction to enforce arbitral award: "In an action to execute on a judgment, due process concerns are satisfied, *assuming proper notice*, by the previous rendering of a judgment by a court of competent jurisdiction.") (citation omitted); *Inzajat Tech. Fund, B.S.C. v. Najafi*, No. C11-04133, 2012 U.S. Dist. LEXIS 32068, at *5 (N.D. Cal. Mar. 9, 2012) ("Typically, *quasi in rem* jurisdiction is insufficient to establish personal jurisdiction over a non-resident defendant. However, in an action to confirm or enforce an arbitration award, a court may exercise jurisdiction over a non-resident defendant's property."). Each of the foregoing cases enforced arbitral awards under *quasi in rem* jurisdiction without engaging in a minimum-contacts analysis. The District Court cited no authority to the contrary.

### B. The Panel Qualifies as a "Court of Competent Jurisdiction" Under *Shaffer*

The Panel qualifies as a "court of competent jurisdiction" under *Shaffer* because it possessed clear authority to adjudicate the dispute. *See Equipav*, 2024 U.S. Dist. LEXIS 9222, at *18–19 ("Minimum contacts

are not required" because "an arbitration panel with personal jurisdiction over [Bertin] has already adjudicated [Equipav]'s claims against [Benin] and determined that he is a debtor of [Equipav]."); *Crescendo Mar. Co. v. Bank of Communs. Co., 2016 U.S. Dist. LEXIS 21824, 2016 WL 750351 at *14 (S.D.N.Y Feb. 22, 2016)* ("arbitration panel with personal jurisdiction over BOCOM has already adjudicated the underlying claims and determined that BOCOM is a debtor of Crescendo; this is merely an action to recover on that debt."); *Zelezny*, 2001 U.S. Dist. LEXIS 13888, at *9–10 (same, "an arbitration panel with personal jurisdiction over Zelezny has already adjudicated CME's claims against Zelezny and determined that he is a debtor of CME; the purpose of the instant proceeding is to collect on that debt.").

The Award meets this standard, as the Panel expressly considered and confirmed its jurisdiction over Issac and the dispute, concluding that the parties' submission to its authority under Halacha was "clear" and "unequivocal." *See supra* note 3. This sequence fully satisfies the due-process standard in *Shaffer*, as confirmed by the weight of federal authority.

The District Court's categorical assertion that an arbitral tribunal

never can constitute a court of competent jurisdiction unless the award is confirmed in another court is contrary to law. Federal courts—including *Crescendo, Equipav, La Dolce Vita, Zelezny, Bunge, Inzajat*, and *Baldwin*—uniformly hold that an arbitral panel which exercises personal jurisdiction and issues an award meets *Shaffer*.

### C. A Final Arbitral Award Is the Functional Equivalent of a Judgment

A final arbitral award is the functional equivalent of a judgment and does not require advance "conversion" or confirmation by another court. The District Court incorrectly held that the *Shaffer* exception was unavailable because the Award had not been "converted into a judgment." DKT.92 at 49–50. The Court's reasoning implies that the Award first must be affirmed by another court in the forum where it was originally entered. This reasoning is faulty.

*First*, that rationale is untenable, given that the Award was entered in the District Court's *own* District—the primary jurisdiction. *Corporación AIC, SA v. Hidroeléctrica Santa Rita S.A.*, 66 F.4th 876 (11th Cir. 2023) (*en banc*) (primary jurisdiction of non-domestic award is forum where entered); *see also Commodities & Mins. Enter. v. CVG Ferrominera Orinoco*, C.A., 111 F.4th 1294, 1299 (11th Cir. 2024) (award

from arbitration held in New York made United States primary jurisdiction). Yet, the District Court's ruling effectively leaves the Award immune from enforcement or challenge anywhere.

*Second*, in reaching its erroneous conclusion, the District Court disregarded over a century of jurisprudence that accords final arbitral awards the same validity and enforceability as a judgment rendered by a court unless very limited grounds are established to not enforce it. Indeed, it is well-established that Federal Courts applying *Shaffer* treat final arbitral awards as equivalent to judgments for jurisdictional purposes. *See Crescendo*, 2016 U.S. Dist. LEXIS 21824, at *14 (rejecting argument that *Shaffer* applies only to state-court judgments).

*Third*, pursuant to the New York and Panama Conventions, routine enforcement of international arbitral awards is the rule—not the exception and review is "very limited." *Brown v. Rauscher Pierce Refsnes, Inc.*, 994 F.2d 775, 778 (11th Cir. 1993). The Conventions sharply limit the grounds for refusing enforcement and require significant deference to the arbitral panel's determinations; they impose no prerequisite that an award be "converted" into a judgment. "One of the goals of the New York Convention was 'to facilitate the enforcement of arbitration awards

by enabling parties to enforce them in third countries without first having to obtain either confirmation of such awards or leave to enforce them from a court in the country of the arbitral situs." *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 500 F.3d 571, 576 (7th Cir. 2007). The District Court turned that principal on its head—it would require Salomon to have confirmed the award in another, *secondary* jurisdiction. That is directly inconsistent with *AIC*.

The Conventions, and the FAA for that matter, confine judicial refusal to enforce a final arbitral award to a handful of exceptional circumstances and mandated that district courts give arbitration panels the utmost deference. Nothing in the Convention justifies denial of enforcement simply because an award has not first been reduced to a court judgment in another other jurisdiction, especially a secondary one. Imposing an extra-statutory conversion requirement disregard controlling law and treaty obligations.

### D. Respondent's Florida Assets Satisfy the Factual Predicate for *Quasi in Rem* Type II Jurisdiction

*Quasi in rem* jurisdiction requires identification of property owned by the respondent within the forum. *Vantage Mezzanine Fund II P'ship Acting Through Vantage Mezzanine Fund II Pty. Ltd. v. Taylor,* 2024 U.S.

Dist. LEXIS 175937, at *9 (S.D.N.Y. Sept. 27, 2024) (*quasi-in-rem* confirmation over bank account funds); *Equipav*, 2024 U.S. Dist. LEXIS 9222, at *18–19 (court had *quasi-in-rem* jurisdiction over property located in the district); *La Dolce Vita Fine Dining Co. v. Zhang Lan*, 2023 U.S. Dist. LEXIS 23196, at *9 (S.D.N.Y. Feb. 10, 2023) (argument that respondent not own apartment or hold title "not come close to overcoming evidence" indicating "interest in the apartment sufficient to support the Court's quasi in rem jurisdiction."); *Crescendo*, 2016 U.S. Dist. LEXIS 21824, at *15 ("[b]ecause BOCOM maintains sufficient assets in New York to satisfy the awards, the Court has quasi in rem jurisdiction to hear the petition and enforce the awards").

All the law requires is a "good-faith allegation" that respondent owns property within the district. *World Wide Supply Ou v. Quail Cruises Ship Mgmt.*, 803 F.3d 1255, 1260 (11th Cir. 2015). Issac conceded ownership of specifically identified assets in Florida: a bank account utilized for expenses (DKT.25-1 ¶12); a vehicle registered in Florida (DKT.63-5, 98:19–21, Ex. 1); a stock certificate for NMB Realty which holds the Miami Home (DKT.85-1, 38:14–16, 39:8–40:9,Ex.2; DKT.51¶¶18–19); a beneficial interest in a Northern Trust account

Reinhard manages (DKT.85-1,27:21–28:17, Ex. 2; DKT.51¶¶21–22); and an equitable interest in the Miami Home. (DKT.85-1,38:14–16,39:8–14, Exs. 2-4). These assets surpass the requisite specificity threshold.

The District Court's ruling undermines settled law and strong federal policy favoring reliable enforcement of international arbitral awards. This Court should reverse.

## CONCLUSION

For the foregoing reasons, Appellant respectfully requests this Court to reverse and remand for further proceedings.

Date: September 12, 2025

Respectfully submitted,

Edward M. Mullins
Daniel Alvarez Sox
Reed Smith LLP
200 S. Biscayne Blvd Ste 2600
Miami, FL 33131
Tel.: 786-747-0200

Carlos F. Concepcion
Concepcion Global PLLC
200 S. Biscayne Blvd Ste 2800
Miami, FL 33131
Tel: 305-444-6669
*Counsel for Petitioner-Appellant*
*Salomon Btesh*

## CERTIFICATE OF COMPLIANCE

1. The undersigned hereby certifies that this Brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B). This Brief contains 12,985 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f).

2. This Brief complies with the typeface requirements of Fed. R. App. P 32(a)(5) and the type style requirement of Fed. R. App. P. 32(a)(6) because the Brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

Respectfully submitted,

*/s/ Edward M. Mullins*
Edward M. Mullins

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 12, 2025 a true and correct copy of the foregoing was filed using the court's ECF system, which sent an email notification of such filing to all CM/ECF participants in this case.

Date: September 12, 2025

*/s/Edward M. Mullins*
Edward M. Mullins